**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| ROBERT AYER and STEPHEN WING, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:10-cv-00414-DBH |
| | ) | |
| DENNIS PIKE, et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON MOTION FOR JUDGMENT ON THE PLEADINGS
AND FOR SUMMARY JUDGMENT**

Robert Ayer and Stephen Wing filed separate actions in state court against the defendants

seeking to hold them liable for the introduction of an offensive substance into their food by a

correctional officer at the Franklin County Jail and retaliatory reactions by correctional officials

to their complaints about the incident. The two complaints by Robert Ayer and Stephen Wing

were removed from state court to federal court by the defendants. In turn, this Court granted a

motion to consolidate the two cases because the claims arose out of virtually identical facts. The

allegedly adulterated food was given to Wing by jail staff on his return to the facility from work

release outside of normal food service hours and Wing shared his food with Ayer.[1] The

defendants have moved for judgment on the pleadings as to Count I of the complaint which is

facially premised on state tort law and for summary judgment on behalf of all the defendants

except Defendants Wyman and Quick on the federal constitutional claims. The plaintiffs have

---

[1] The plaintiffs are represented by the same attorney.

filed a response and I track their theories as to each defendant in that pleading in setting forth the parameters of their claims below.

I now recommend that the Court grant judgment on the pleadings as to all defendants as to Count I except Wyman and Quick and grant summary judgment to Sheriff Dennis Pike, the Franklin County Jail, Douglas Blauvelt[2], Sandra Collins, Tara Hamlin, Thomas Plog[3], and Walter Fails[4] as to all federal constitutional claims.  Should this recommendation be accepted this leaves the federal constitutional claims and state tort claims for assault and battery against Samantha Wyman and Nicole Quick.

## DISCUSSION

### *Judgment in Favor of Defendants Plog and Hamlin*

The plaintiffs concede that defendants Thomas Plog and Tara Hamlin are entitled to judgment on all claims against them.  (Resp. Mem. at 4.)  These two defendants should be granted judgment with prejudice due to this concession.

### *Maine Tort Claims Act Count*

All defendants rebuff Count I of the plaintiffs' complaints as follows:

> Count I of Plaintiffs' Complaints is entitled "Tort Claims Act."  Plaintiffs' allegations in this count refer to specific requirements of the Maine Tort Claims Act "MTCA", but the Plaintiffs never specify what tort they allege the Defendants engaged in. Wing's Complaint, ¶¶ 31-36; Ayer's Complaint, ¶¶ 31-36. The MTCA is not a substantive cause of action. Ellis v. Meade, 887 F. Supp. 324, 330 n.7 (D. Me. 1995); See also, Parlin v. Cumberland County, 659 F. Supp. 2d 201, 213 n.13 (D. Me. 2009). The MTCA is the statutory reformulation of the doctrine of sovereign immunity. Rutherford v. Portland, 494 A.2d 673, 675 (Me. 1985).

---

[2]      The two removed complaints spell Blauvelt as "Blouvelt."  Blauvelt is the correct spelling.  (See Blauvelt Aff., Doc. No. 24.)

[3]      The two removed complaints spell Plog as "Plogg."  Plog is the correct spelling.  (See Defs' Mot. at 1 n.1, Doc. No. 26.)

[4]      The two removed complaints spell Fails as "Failes."  It is evident that the former is the correct spelling. (See Fails Dep., Doc. No. 21.)

> For this reason, Count I of Plaintiffs' Complaints should be dismissed for failure
> to state a claim upon which relief could be granted.

(Mot. Summ. J. at 2-3.) In their responsive memorandum the plaintiffs have done very little to clarify their theory of recovery as to specific torts under Maine law; they simply reiterate their factual allegations. They were given every opportunity to inform the court of their theory of recovery under Maine law should they succeed in rebuffing the defendants' immunity argument. I conclude that the majority of the defendants are entitled to judgment on the pleadings on Count I. The plaintiffs have been allowed ample opportunity to clarify the substantive theory of recovery as to each of these defendants and all they have done is assert that the defendants are not entitled to immunity because the insurance policy on the record is for 2008 and not 2009 and argue that the defendants are not shielded by immunity for intentional harm. (Resp. Mem. at 9-10.) At this stage of the litigation it is not sufficient to 'cry tort.' "The fact that Plaintiffs never name the tort," plaintiffs' counsel opines, "such as assault and battery, is not fatal. Defendants cite no authority for such a conclusion." (Resp. Mem. at 3.) The defendants have cited authority for their position and the plaintiffs have done nothing to rectify the ambiguity so as to allow the court to analyze specific state tort claims against each defendant on the summary judgment record. The only defendants who might be implicated in an infliction of an intentional harm via an assault and battery are Quick and Wyman.[5] It should not be left for me to develop a tort theory of individual recovery against the other defendants. All state law claims except those

---

[5] I concede that I am giving the benefit of the doubt to the plaintiffs when it comes to tort claims against Wyman and Quick in the face of a very sketchy response by plaintiffs' counsel regarding Count I. The defendants may well object given the fact that there is no specific tort identified in the complaints and the response of the plaintiffs to the defendants' Count I argument is exceedingly vague. On the other hand, Wyman and Quick have not moved for summary judgment so resolution of the federal constitutional claims against them certainly awaits further adjudication or negotiation.

against Quick and Wyman should be dismissed with prejudice pursuant to Federal Rule of Civil

Procedure 12(c).[6]

### *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "Once a properly documented motion has engaged the gears of Rule 56, the

party to whom the motion is directed can shut down the machinery only by showing that a

trialworthy issue exists." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)

(citing National Amusement Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)).

### **Summary Judgment Facts**

Stephen Wing was incarcerated at the Franklin County Jail from February 29, 2008,

through September 30, 2008. At that time Wing was a sentenced inmate. Ayer was incarcerated

at the Franklin County Jail from June 2008 through March 2009. At that time Ayer was a

sentenced inmate.

Samantha Wyman was a corrections officer at the Franklin County Jail for approximately

nine months until she was terminated in September 2008.

---

[6]     With respect to the Maine Tort Claims Act, the defendants set forth that the Maine County Commissioners
Association Self-Funded Risk Management Pool (Risk Pool) is a public self-funded pool established pursuant to 30-
A M.R.S.A. ch. 117. (SMF ¶ 86; Resp. SMF ¶ 86.) Franklin County is a Named Member of the Risk Pool and is
provided with insurance-type coverage pursuant to a document entitled "Maine County Commissioners Association
Self- Funded Risk Management Pool Coverage Document." (SMF ¶ 87; Ulmer Aff. ¶ 3; Magoon Aff.¶ 3.) The
Coverage Document specifically excludes any coverage for any cause of action seeking tort damages for which the
County is immune pursuant to the Tort Claims Act, and limits coverage to those areas for which governmental
immunity is expressly waived by the Tort Claims Act. (SMF ¶ 88; Ulmer Aff. ¶¶ 4-7; id. Ex. A .) Other than the
insurance-type coverage provided to Franklin County under the Risk Pool's Coverage Document, Franklin County
has not procured insurance against liability for any claim against the County or its employees for which immunity is
not otherwise waived under the Maine Tort Claims Act. (SMF ¶ 89; Resp. SMF ¶ 89.) The plaintiffs' Notices of
Claim were filed in February and March 2009. (SAMF ¶ 138; Resp. SAMF ¶ 138.)

Walter Fails started as a part-time corrections officer in June 2007 at the Franklin County Jail. He became full-time in October 2007, and worked there until April 2009. Fails was not on duty when the food tampering incident occurred at the jail. Fails became aware of the food tampering incident approximately three to four days after the incident occurred.

Tara Hamlin began her employment at the Franklin County Jail as a cook, but then became a corrections officer. After she became a corrections officer, she would fill-in in the kitchen if necessary. On September 5, 2008, Hamlin was working as a cook at the Franklin County Jail. Hamlin was not aware that the food was altered, if it was, before she left work.

Thomas Plog has been a corrections officer at the Franklin County Jail since 1992. Plog was not on duty on the night of the food tampering incident.

Nicole Quick has been employed by the Franklin County Jail as a corrections officer since July 2002.

Sandra Collins was the Jail Administrator from May 1999 until July 30, 2009, when the Jail became a 72-hour holding facility. As Jail Administrator, Collins was responsible for managing the daily operations of the Jail. On September 5, 2008, Collins worked in her office from 9:15 a.m. to 8:45 p.m. If the incident occurred while she was at the jail, no one said anything about it to her. When Collins left the building, she checked in the control room, she saw that Chinese food had been delivered, but no one said anything about any food contamination. September 5, 2008, was a Friday, and after leaving work that day, Collins had surgery on Monday and did not return to work until September 16, 2008.

Douglas Blauvelt started working full-time at the Franklin County Jail in 2003. Blauvelt became the Assistant Jail Administrator shortly after April 30, 2008. Blauvelt first learned of the incident after it happened when Officer Plog informed him. (SMF ¶¶ 1 -24; Resp. SMF ¶ 1- 24.)

Dennis Pike has been the Sheriff of Franklin County since January 1, 2001. (SMF ¶ 25; Resp. SMF ¶ 25.) As Sheriff, Pike is responsible for overseeing and administering the Sheriff's Department, which includes the enforcement division, county jail, and dispatch center. (SMF ¶ 26; Resp. SMF ¶ 26.) Pike heard about the incident after it had happened (SMF ¶ 27) from Jail Administrator Collins and Stephen Wing, before Officer Plog went to Assistant Jail Administrator Blauvelt. (Resp. SMF ¶ 27; Pike Dep. at 11,14-15, 41-42, Wyman Dep. at 24-25; SAMF ¶ 94 ; Resp. SAMF ¶ 94.)

In September 2008, Wing and Ayer were housed in S-7, also known as the rec room, which was used to house workers. On September 5, 2008, Quick came on at approximately 5:55 a.m. Wyman came on duty at 2:00 p.m. Quick was the acting supervisor beginning at 2:00 p.m. When the actual supervisor is not on, the most senior officer is the acting supervisor. At 2:40 p.m., Ayer returned to the cell from duty.

Meals at the jail were served at 7:00 a.m., 11:00 a.m., and 5:00 p.m. The evening meal on September 5, 2008, was spaghetti and veal patty. Hamlin made the meal and served the meal at 5:00 p.m. to the inmates who were there. Ayer ate his meal at 5:00 p.m.

At 8:01 p.m., Wing came in the lobby from work release. If an inmate came in later than dinnertime, the kitchen staff would prepare a dinner tray, cover it, and put it in the control room. Anything that needed to be refrigerated would be put in the refrigerator.

On September 5, 2008, Hamlin left a tray in the control room for the worker who was out. After leaving the tray in the control room, Hamlin went back to the kitchen and cleaned up and left. When the inmate came in, anything that needed to be heated up would be put in the microwave. Then the things would be taken from the refrigerator and the tray would be taken to the intake area. The inmate would then carry the tray to his cell, where it would remain until an

officer picked it up. Wing's food was in the control room that night and Wyman, Quick, and Officer Mitchell Ryan[7] were also in the control room. There was Chinese food in the control room that some of the officers were eating that night. (SMF ¶¶ 28-46; Resp. SMF ¶¶ 28-46.)

According to the defendants, Wyman said it would be funny to put a little bit of hot sauce in Wing's food but they admit for summary judgment purposes that the substance added was pepper spray. (SMF ¶ 47 & n.1: Resp. SMF ¶ 47; SAMF ¶ 90.)[8] The plaintiffs seem to think that their constitutional claims turn in some measure on the question of whether or not it was hot Chinese mustard or pepper spray that was mixed into Wing's food that was then shared with Ayer. There being no evidence whatsoever of tangible physical harm as a consequence of the alleged adulteration[9], I believe that this particular dispute is essentially immaterial to the resolution of this dispositive motion. However, giving the plaintiffs the benefit of the inference that they clamor for, I assume it was pepper spray/mace and not Chinese mustard. Wyman put a small amount of the substance in the middle of the food. (SMF ¶ 48; Resp. SMF ¶ 48.) There is

---

[7]     Ryan is not a defendant in this consolidated action.

[8]     I conclude that the question of whether or not there is a trial worthy issue on the record before me does not require a weighing of the facts apropos whether the substance introduced was hot mustard from a take-out order or pepper spray. In their responsive Paragraph 47 the plaintiffs state:

> A. It was not Chinese "hot sauce" that was put in the food. Pike dep. p.15; Ayer dep. pp. 32-33 & 35; Wing dep. pp 52, 55-56, 64-65, 67-68 & 70-71.
> B. Wyman had no authority to use pepper spray. Collins dep. p. 46.
> C. Nicole Quick had the right to carry pepper spray. Collins dep. p. 46.
> D. Quick had a personal canister of pepper spray on her equipment belt. Quick dep. pp. 9-11, Collins dep. pp. 43-46.

(Resp. SMF ¶ 47; see id. ¶¶ 48, 51, 52,63, 64, 68; SAMF ¶¶ 110, 111 .) Because the plaintiffs insist that it was an unauthorized use of pepper spray by Wyman and not the introduction of hot mustard I give them the 'benefit' of that inference. (See SAMF ¶¶ 91-93; Resp. SAMF ¶¶ 91-93, 95.)

        In a related rift the defendants assert that everyone Blauvelt, who was investigating the incident, spoke to said it was Chinese hot sauce. (SMF ¶ 70; Blauvel Dep. at 19-20.) The plaintiffs qualify this statement towards demonstrating that it was pepper spray and not hot sauce. (Resp. SMF ¶ 70.) The same approach holds, I will assume that the substance was pepper spray or mace.

[9]     I acknowledge that Ayer thinks that he did not get a satisfactory reaction to his complaints about the medical after effects of the incident. Other than his own 'say so' there is not any record evidence that his complaints were ignored. It is also appears from the deposition of Ayer that the defendants have record evidence from Ayer's own doctors that his respiratory and ear complaints could not be related to this incident.

7

no dispute that Wyman does not believe she put enough of the substance in to harm the inmates and that she did it as a joke. (SMF ¶¶ 49, 50; Resp. SMF ¶¶ 49, 50.) Officer Ryan stirred the substance into the food and delivered this food to the inmate. Officer Quick was in the control room the whole time and she saw Wyman put the substance in the food. (SMF ¶¶ 51, 52: Resp. SMF ¶¶ 51, 52.) The supervisory officer at the time of the food tampering event, Quick did nothing to stop or interfere with the tampering though she saw it being done. (SAMF ¶¶ 112, 118; Quick Dep. at 20-21, 28, 36-37; Blauvelt Dep.at 19, 40; Pike Dep. at 17, 23, 27; Collins Dep. at 59, 68.)

According to the plaintiffs, all incidents are required to be recorded in the control room logbook or other logbooks. (SAMF ¶ 113; Collins Dep. at 17-18.) The food tampering incident should have been logged but it was omitted from the September 5, 2008, control room log book. Omitting logging that incident is a violation of the Sheriff's rules. (SAMF ¶¶ 114, 115, 116; Collins Dep. at 25.) Corrections Officer Nicole Quick signed off on the September 5, 2008, logbook. (SAMF ¶ 117; Collins Dep. at 22.)

Wing got his tray and walked back to his cell with it. Wing set the tray on a table in the cell and split his food with Ayer. Wing ate a small amount of the food and Ayer ate about three bites of the food. Wyman, Quick, and Ryan watched the monitor in the control room after Wing got his food to see what happened. Officer Corinna Whitney[10] came into the control room while everybody was watching the monitor. (SMF ¶¶ 53-57: Resp. SMF ¶ 53-57; SAMF ¶ 119.)

Thomas Plog was informed of the food tampering incident by Whitney. After being informed of the incident, Plog spoke to Wing, who confirmed that his food had been tampered

---

[10]    Whitney has not been named as a defendant.

8

with. After receiving this confirmation, Plog immediately went to his supervisor, Assistant Jail Administrator Blauvelt and reported the incident to him. (SMF ¶¶ 58-60; Resp. SMF ¶¶ 58-60.)

Blauvelt did an investigation of the incident (SMF ¶ 61) although the plaintiffs insist that the reach of his investigation was inadequate (Resp. SMF ¶ 61). They state that Blauvelt's "investigation" consisted of four corrections officers' interviews and did not include any interviews of either plaintiff, any inquiry about harm or injury to plaintiffs, or any inquiry of the actual substance put into the food. Blauvelt also did not review logbooks or look at video camera records and had no experience or training in investigations. (Id.; SAMF ¶¶ 100-105.)

There is no dispute that Blauvelt spoke with Quick on the afternoon on September 10, 2008. Quick admitted to seeing and knowing that Wyman put the hot substance in the food. Blauvelt spoke with Officer Ryan as part of this investigation who admitted to seeing and knowing that Wyman had put the substance in Wing's supper and he admitted to serving it. Blauvelt spoke to Officer Wyman over the phone about the incident on September 11, 2008. Wyman told Blauvelt that she was going to take total responsibility for the incident. Wyman told Blauvelt she put the substance -- hot sauce or pepper spray -- in the food, that she was very apologetic, and that she had stated to the inmates that it was a joke.

Blauvelt did not receive an inmate request or grievance from the inmates about this incident.[11] Blauvelt spoke to Collins, Sheriff Pike, and Lieutenant Yeaton from the Sheriff's Department when he did his investigation. Blauvelt spoke to Lieutenant Niles from the Sheriff's Department to review the investigation because Niles has done a lot of internal investigations. A

---

[11] The defendants have not asserted that this suit is barred due to a failure to exhaust administrative remedies as required by 42 U.S.C. § 1997e. Apparently, neither plaintiff is currently confined in a jail or correctional facility. There is no de facto rule that a release from a correctional institute absolves a plaintiff from the exhaustion requirement. See, e.g., Cox v. Mayer, 332 F.3d 422 (6th Cir. 2003). These complaints were filed in state court in late August 2010. It appears from the record that both plaintiffs were released from custody prior to filing this suit.

few days after the incident, before Collins returned to work, Blauvelt called Collins on the phone and advised her that food had been tampered with and that he was doing an investigation. Collins agreed with the discipline administered, which was to terminate Officer Wyman and that Ryan and Quick would receive a verbal warning. Wyman was terminated in September 2008 for placing something in an inmate's food. (SMF ¶ 62-69, 71-75; Resp. SMF ¶ 66-69, 71-75.) According to the defendants, Quick was put on probation for eighteen months as a result of this investigation (SMF¶ 76) although the plaintiffs claim that there is no record of any disciplinary action in Quick's personnel file (Resp. SMF ¶ 76).

The plaintiffs maintain that the only people Blauvelt spoke with were the four corrections officers, who uniformly said "Chinese hot sauce." Blauvelt never interviewed the plaintiffs who both said the substance was much stronger, being pepper spray or mace. Jail Administrator Collins repeated the statement of "hot sauce." Sheriff Pike was told by Wing that it was pepper spray or mace. Nicole Quick and Samantha Wyman both admitted it was mace or pepper spray. (Resp. SMF ¶ 70; SAMF ¶¶ 108- 109.)

With regards to policy and custom liability, Sheriff Pike has prepared and signed off on the rules and regulations on how the jail is to be operated. Pike has final decision-making authority regarding the policies and procedures and training at the Franklin County Jail. Several of those relate to food preparation. Franklin County Jail Policies and Procedures E-300 entitled "Food Services", E-301 entitled "Inmate Dining", E-303 entitled "Meal Plan", E-310 entitled "Kitchen Sanitation", E-320 entitled "Food Preparation", and E-330 entitled "Feeding Procedures" are the official policies and procedures of the Franklin County Jail and were in effect on the date of the incident in this lawsuit.[12] These policies require that food be wholesome

---

[12]    A copy of these policies is attached to the statement of material facts as Exhibit 5.

and healthy for the inmates. All corrections officers have to familiarize themselves with the policies and have to sign off on each specific policy. (SMF ¶¶ 77-82; Resp. SMF ¶ 77-82.) The defendants insist that no instructions or directions are given to jail staff regarding the preparation and serving of meals that are in any way inconsistent with the contents of these policies. (SMF ¶ 83; Pike Aff. ¶ 4.) The plaintiffs respond that the supervisory officer at the time of the food tampering event did nothing to stop or interfere with the tampering though she saw it being done. (Resp. SMF ¶ 83; Quick Dep. at 20-21, 28, 36-37; Blauvelt Dep. at 19, 40.)

Other than this particular case, Sheriff Pike is not aware of any prior complaints, allegations, reports, or lawsuits which have included any allegations of food tampering or the adulteration of food at the Franklin County Jail. Sheriff Pike has never perceived or known that there was any need for additional training in this area, primarily because there have never been any problems or complaints other than this lawsuit. (SMF ¶¶ 84, 85; Pike Aff. ¶¶ 5, 6.)[13]

### *Retaliation Facts*

There is a dispute of fact concerning the plaintiffs' assertion that after the food tampering event, Corrections Officer Quick went into the plaintiffs' area and threatened them about talking about that event. (SAMF ¶ 120; Ayer Dep. at 32, 34-35; Wing Dep. at 52-53, 70-71.) A few days after the event, Quick made a similar threat to Ayer. (SAMF ¶ 33; Ayer Dep. at 33.) Quick denies these encounters and insists that she never threatened these two plaintiffs over the incident. (Resp. SAMF ¶¶ 120, 121; Quick Dep. at 32, 34.) I reiterate, Quick is not moving for summary judgment.

---

[13]    I strike the plaintiffs' responsive statements of fact to these two paragraphs because they are premised entirely on hearsay. (See Resp. SMF ¶¶ 84, 85; Ayer Dep. at 62-64.)

According to the plaintiffs, Ayer's repeated medical requests for treatment after the food tampering event were ignored. (SAMF ¶ 122; Ayer Dep. at 36-37, 59.) The defendants respond that Ayer did not make repeated medical requests for treatment after the food tampering incident. (Resp. SAMF ¶ 122; Biegaj Aff. ¶ 7.) In addition, they point out that the jail contracted with ARCH to provide medical services to the Jail, and pursuant to jail policy, none of the jail's personnel were to diagnose or treat an inmate's illness. These decisions were left to the health care provider or nurse. (Resp. SAMF ¶ 122; Biegaj Aff. ¶¶ 2-3.)

On September 26, 2008, Jail Administrator Collins warned Ayer that he could have been charged with attempted escape for an incident that day. (SAMF ¶ 123; Resp. SAMF ¶ 123.) Ayer had been cleared by two corrections officers to leave the jail for work release that morning. Defendants admit that two officers allowed Ayer to leave that morning, but they did not have the proper authority for this, and they were spoken to because of these actions. (SAMF ¶ 124; Collins Dep. at 72-81.) Collins called Ayer back to warn him that he could have been so charged. (SAMF ¶ 125; Collins Dep. at 72-73; Ayer Dep. 59.)

In January 2009, Officer Quick filed a complaint against Ayer alleging disrespect. (SAMF ¶ 126; Resp. SAMF ¶ 126.) Ayer disputed the allegations and he was not disciplined. (SAMF ¶ 127; Resp. SAMF ¶ 127.) However, Ayer was not given one day of good time credit because this incident report remained in his file. (SAMF ¶ 128; Resp. SAMF ¶ 128.)

There were several other confrontations between Ayer and corrections officers. (SAMF ¶ 129; Resp. SAMF ¶ 129.)[14] On February 9, 2009, Ayer filed an inmate request (a complaint) that he was not getting public work for which he contends he was eligible. (SAMF ¶ 131; Resp.

---

[14] I strike Statement of Additional Fact ¶ 130 on hearsay grounds; Ayer is indicating that someone told him that Corrections Officer Fails had tried to instigate physical retaliation against him. (SAMF ¶ 130; Ayer Dep. at 47.)

SAMF¶ 131.)  With Jail Administrator Collins's notation of "mine" on that request, Ayer felt

that he was being told, "I was their personal little slave."  (SAMF ¶ 132; Ayer Dep. at  52-53;

Ayer Aff. Ex. C.)  The defendants respond that Collins wrote "mine" in response to Ayer's

question about on whose authority he was kept in the jail.  Collins required Ayer to work in the

jail that day because he was the only worker available.  (Resp. SAMF ¶ 132; Collins Dep. 73.)

On January 19, 2009, Ayer observed Fails opening a letter Ayer had written to his

attorney which had been placed in an addressed envelope.  (SAMF ¶ 133;   Ayer Dep. at 50.)

Opening such correspondence is a violation of the Sheriff's Office rules.  (SAMF ¶ 134; Resp.

SAMF ¶ 134.)  According to the defendants, Fails was involved in a shakedown of the recreation

room, where Ayer was housed and moved some of his personal belongings, including letters, but

Fails did not read the letters.  (Resp. SAMF ¶ 133; Fails Dep. at 15, 18-19.)[15]  For purposes of

this summary judgment record, the defendants do not dispute that Fails (a neighbor of Ayer's)

told Ayer that he had gone down to Ayer's house to check on his (Ayer's) girlfriend.  (SAMF ¶

136; Resp. SAMF ¶ 136.)  Ayer took all of these incidents as threats and attempts to intimidate

him.  (SAMF ¶ 137; Ayer Dep. at 59; Resp. SAMF ¶ 137.)[16]

## DISCUSSION

### Eighth Amendment

As the record stands, the plaintiffs have not created a trial-worthy issue as to the

defendants moving for summary judgment with respect to an Eighth Amendment cruel and

---

[15]     I strike Statement of Additional Fact ¶ 135 on hearsay grounds.
[16]     The defendants dispute this paragraph forwarded by the plaintiffs because the record support for the
statement does not address the conduct of defendants other than Quick and Collins.

unusual punishment claim stemming from the insertion of pepper spray into Wing's dinner, then shared with Ayer.[17]

A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 828–29 (1994) (citing Helling v. McKinney, 509 U.S. 25 (1993), Wilson v. Seiter, 501 U.S. 294 (1991), and Estelle v. Gamble, 429 U.S. 97 (1976)). Farmer, a case involving a failure to protect claim, explained:

> Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious," Wilson, supra, 501 U.S., at 298; see also Hudson v. McMillian, supra, 503 U.S. [1,] 5[ (1992) ]; a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities," Rhodes [v. Chapman], 452 U.S. [337,] 347 [ (1981) ]. ….
> The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." Wilson, 501 U.S., at 297 (internal quotation marks, emphasis, and citations omitted). To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." Ibid.

511 U.S. at 834 (footnote omitted). See also Wilkins v. Gaddy, 559 U.S. __, __, 130 S.Ct. 1175, 1178- 80 (2010); Williams v. Jackson, 600 F.3d 1007, 1013 -14 (8th Cir. 2010).

Although I recognize that I must draw all reasonable inferences in favor of the plaintiffs, the only inference to draw with respect to the Eighth Amendment claim is that this was a prank conjured by Wyman, tolerated by Quick (who was the acting supervisor), and witnessed with some satisfaction by another staff member who is not named as a defendant. As juvenile as this stunt may have been, there is not a sufficient basis to create a trial worthy issue for deliberate indifference by the individuals not directly involved in this episode.

---

[17] There is no evidence that Wyman or any of the other correctional staff present expected Wing to share his meal with Ayer. Ayer had already had his regularly scheduled dinner.

With regards to Sheriff Pike the plaintiffs rest their claim of deliberate indifference on the assertion that he almost immediately knew of the allegation of the application of mace to Wing's food but did nothing personally to investigate that claim beyond ordering the investigation even though he had already concluded and ordered the disciplinary action against Wyman and Quick. (Resp. Mem. at 8.)[18]  Vis-à-vis Collins, the plaintiffs also only implicate her in after-the-act conduct, including the warning that Ayer could have faced escape charges related to his public work eligibility.  (Id.)[19]  Blauvelt, they highlight, was the person who undertook the investigation which they describe as a whitewash to limit the damage to the jail and the county.  (Id.)[20]

In short, the plaintiffs' theory against these defendants is entirely built upon complaint allegations and limited record evidence that they had after-the-fact knowledge of the conduct of Wyman and Quick with respect to this incident.[21]  Certainly mere knowledge that an alleged Eighth Amendment violation may have occurred does not generate a deliberate indifference claim, if so the pool of potential defendants would be every Franklin County Jail employee who heard about the incident.

Even if the plaintiffs had filed a formal grievance as to the incident that Pike or Blauvelt were responsible for investigating, their conduct in unsatisfactorily resolving an actual grievance would not be a basis for deliberate indifference liability.  See Gallagher v. Shelton, 587 F.3d

---

[18]     At his deposition Ayer describes Pike as "the finest law enforcement officer" he had ever met.  (Ayer Dep. at 60.)

[19]     I acknowledge that Ayer was offended by Collins's notation of "mine" as to his request for public work and that it made him feel as though he was "their personal little slave" but this does not relate to his core deliberate indifference claim pertaining to the food incident.  I address the retaliation claim below which is really the only plausible claim that the plaintiffs have against Collins.  I only include her in this discussion because the plaintiffs have done so in their response to the dispositive motion.

[20]     "And," the plaintiffs assert, "Corrections Officer Nicole Quick, who watched the food being adulterated …. was the Acting Supervisor of the Franklin County Jail at the time."  (Id. at 8-9.)  As earlier indicated, the defendants have not moved for summary judgment on the constitutional claims against Quick.

[21]     Officer Ryan according to the record stirred the substance into the food after it was applied.  However, I reiterate, the plaintiffs have not named Ryan as a defendant.

1063, 1069 (10th Cir.2009) ("We agree with the reasoning in our previous unpublished decisions that a denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983.... Because Gallagher's only allegations involving these defendants relate to the denial of his grievances, he has not adequately alleged any factual basis to support an "affirmative link" between these defendants and any alleged constitutional violation.")(internal citations omitted); Thomas v. Courtroom Deputy for Judge Ronan, Civ. No. 10-0536-PHX-RCB (EV), 2010 WL 2292947, 2 (D. Ariz. June 8, 2010)("[W]here a defendant's only involvement in allegedly unconstitutional conduct is the denial of administrative grievances, the failure to intervene on a prisoner's behalf to remedy the alleged unconstitutional behavior does not amount to active unconstitutional behavior for purposes of § 1983.").  In this case the record is that Pike instigated an investigation and Blauvelt undertook an investigation even though a grievance had not been filed.

Resolving this motion does not require the court to do an involved analysis of the extent of the plaintiffs' injury, see Chambers v. Pennycook, 641 F.3d 898, 906 n.3 (8th Cir. 2011),[22] but only to weigh whether there is sufficient evidence to send to a jury a claim that these defendants can be affirmatively linked to the alleged Eighth Amendment violation.  In this case the plaintiffs must create a genuine dispute of fact that these defendants were deliberately indifferent to the potential of cruel and unusual punishment in the shape of the alleged harm that arose from the adulteration of Wing's food by Wyman without intervention by Quick.  In other words, there is no cruel and unusual punishment/supervisory liability claim in a failure to adequately respond (in the plaintiffs' mind) to a single incident of harm without a concurrent showing that more harm

---

[22]     This prong of the Farmer analysis may well come into play apropos the claims against Wyman and Quick. The depositions taken of Ayer and Wing involved questioning on their ability to document medical problems stemming from the ingestion of the mace.

resulted because of the failure to respond to earlier incidents of adulterated food in the facility in general or similar misconduct by the particular defendants involved in this incident.  See Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010).[23]

### Retaliation Claim

With respect to federal question jurisdiction this leaves the matter of claims of unconstitutional retaliation under the First Amendment with regards to the complaints lodged concerning this conduct.  As the First Circuit recently explained in Hannon v. Beard:

> Because prisoner retaliation claims are "easily fabricated[ ] and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration," courts must insist that such claims are bound up in facts, not in the gossamer strands of speculation and surmise. Bennett v. Goord, 343 F.3d 133, 137 (2d Cir.2003) (internal quotation marks omitted). Thus, in order to survive summary judgment on a retaliation claim, a prisoner must make out a prima facie case by adducing facts sufficient to show that he engaged in a protected activity, that the state took an adverse action against him, and that there is a causal link between the former and the latter. George v. Walker, 535 F.3d 535, 538 (7th Cir.2008); Thaddeus–X [v. Blatter], 175 F.3d [378,] 394 [(6th Cir. 1999)].

645 F.3d 45, 48 (1st Cir.2011).

With respect to the first prong of this inquiry, the plaintiffs have not set forth a clear articulation of what protective activity they engaged in; their theory is simply that they were harmed when eating Wing's food[24] and that certain correctional staff members were concerned that they might complain so they responded with retaliatory threats and restrictions.  There is no record evidence of grievances having been filed within the facility or complaints to any outside entity or person with regards to the food adulteration incident.  Wing stated at his deposition that he made no effort to complain about the incident to jail staff but was approached by Plog who

---

[23]     The only evidence that the plaintiffs attempted to provide was hearsay evidence in Ayer's affidavit that was from a particular jail staff member.  There is no evidence that this conduct was ever learned of by the inmates, let alone, previously grieved by anyone.  By Ayer's own admission this conduct was not recent.

[24]     Obviously this was not a protected activity in this context under the First Amendment.

proactively asked him questions about the incident. (Wing Dep. at 74-75.) I recognize that Ayer asserts he filed numerous requests for medical care but he has not produced any record evidence in support of his assertion.[25] As the defendants indicate, Franklin County Jail's health services are provided by a private contractor and its employees who have not been named as defendants. The plaintiffs have not created a genuine dispute premised on record evidence that jail staff interfered with his attempts to get his requests to the medical staff. Ayer's assertions on this front are entirely conclusory. Furthermore, the simple request for medical treatment without more is not protected activity vis-à-vis the insertion of mace into Wing's food unless the plaintiffs are asserting that the retaliation related to the request for medical treatment. If this is so, they have failed to sufficiently advance this argument and have not supported any such theory with record evidence.

In their response to the dispositive motion the plaintiffs indicate that they want to press ahead with a claim of retaliation against Walter Fails because his "actions and statements are part of the series of events surrounding the food adulteration and the attempts to intimidate." (Resp. Mem. at 4.) The only potentially two admissible areas of evidence as to Fails is that Ayer observed Fails opening a letter Ayer had written to his attorney that had been placed in an addressed envelope and that Ayer was told by Fails, a neighbor, that he had gone to Ayer's house to check on his girlfriend.[26] Ayer might have drawn inferences from this latter conversation but I fail to see how it furthers a jury-worthy constitutional claim against Fails for a First Amendment

---

[25] I note that Ayer did provide documentation as to his disciplinary hearing related to being called back from work release and loosing good time credit. (Doc. No. 28-1.) It is rare for even a pro se prisoner plaintiff to come to the summary judgment stage of litigation empty handed with respect to efforts to seek medical care or related grievances key to claims such as this.

[26] If one reads the entire deposition of Ayer there are more recriminations and invectives contained in that testimony and letters referred to during the deposition but I am assuming that plaintiffs' counsel made a calculated choice to limit his factual record to avoid the introduction of potentially harmful deposition testimony that could harm his clients' litigation position.

retaliation claim. With regards to the envelope opening, there is no tangible evidence that this action, however inappropriate, impeded Ayer's access to his attorney or led to any tangible harm to Ayer because of the revelations contained therein. See Hudson v. O'Brien, Civil Action No. 09-10276-RWZ, 2010 WL 2900529, 3 (D.Mass. July 21, 2010) (unpublished) ("If an attorney's name was listed on the envelope, the opening of this single letter, in violation of prison policy …. and with no alleged injury, is but an isolated incident and, alone, insufficient to state a Constitutional claim."). Furthermore, Ayer has not presented or defended this as a Sixth Amendment challenge. Sticking with his retaliation theory there is no indication on this record that Fails intended Ayer to see the opening of the mail so as to intimidate Ayer.

### *Official Capacity/Policy and Practice/Municipal Liability*

With respect to the plaintiffs' theory of an official capacity/policy and practice/municipal liability claim the only attempt to forward record evidence submitted by the plaintiffs in defense of the request for summary judgment is that Ayer was told by the cook by the name of Esponnette that there had been other incidents of food tampering. (SAMF ¶ 135.) I have already indicated that this is inadmissible hearsay for the truth of the matter asserted and even if Ayer was allowed to testify at trial as he did in his deposition it would not be sufficient to justify sending this claim to the jury.[27]

---

[27] Ayer's deposition testimony in support of this statement of fact was:
A. She told me that she wasn't real surprised about the whole incident and that Mitch Ryan had on numerous occasions gone into the bathroom --
Q. Say it just the way you put it in your letter.
A. Wiped his ass and put his hands all over people's food and things like that.
Q. Anything else Esponnette told you?
A. Specifically regarding this?
Q. Regarding this type of incident in the past prior to the time that it happened to you.
A. Other than that, that's pretty much all I remember her saying about incidents. It was a while ago.
(Ayer Dep. at 62-63.)

The plaintiffs also attempt to buoy this claim by asserting that the investigation of the action appears to be a sham because it happened after disciplinary action had been taken, involved only statements of correctional officers, and totally ignored "the critical issue, the nature of the substance put in the food." (Resp. Mem. at 6.) Plaintiffs' counsel argues that it would be reasonable to infer that the investigation was undertaken after the disciplinary decision with limited fact-finding in order to suppress knowledge of the food tampering event and was conducted "only for the purpose of limiting liability." (Id.) Plaintiffs assert all of their evidence "supports the conclusion that, from the Sheriff on down, the entire jail administration was acting to suppress knowledge of the food tampering event and persuade the Plaintiffs not to take further action." (Id. )

Franklin County may only be held liable under § 1983 for its own unconstitutional action. See Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978). Accordingly, a municipal government will only be held liable when the "execution of [the municipal] government's policy or custom ... inflicts the injury." Id. at 694. See also City of Canton v. Harris, 489 U.S. 378, 388 (1989); DiRico v. City of Quincy, 404 F.3d 464, 468 -69 (1st Cir. 2005). As for the official capacity claims against Sheriff Pike, "A suit against a public official in his official capacity is a suit against the governmental entity itself." Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir.2005).[28]

The plaintiffs do not dispute that the conduct of Wyman and Quick was in violation of written policy, particularly that the food be wholesome and healthy and that all correctional staff are required to familiarize themselves with the policies and sign off on each policy. (SMF ¶¶ 77-

---

[28]     I am highly skeptical of the plaintiffs' seeming assertion that Quick could somehow be responsible under this rubric because she was the acting supervisor at the time in question (see Resp. Mem. at 7) especially because they concede that Pike is responsible for the policies and regulations at the jail and that he has final decision-making authority regarding policies and procedures and training at the jail. However, that question is not in front of me today.

82; Resp. SMF ¶¶ 77-82.)  Obviously there is no policy that personnel spray mace or other adulterating substances be put into the food.  As for a theory of a failure to train, the "liability criteria for failure to train claims are exceptionally stringent." Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir.1998) (citing City of Canton v. Harris, 489 U.S. 378, 388-89 (1989)).  Employees are required to sign off on each policy and there can be little doubt that any more training would have prevented this random act which Wyman admits was a spontaneous and ill-advised prank. The plaintiffs have not attempted to present the court with any evidence or argument that there were specific deficiencies in the training that caused this occurrence.  See Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir. 2010).

With regards to the notion that there was a custom at the jail contrary to the written policy, Whitfield v. Melendez-Rivera summarizes:

> There are two requirements to prove a claim grounded on custom. First, the custom or practice must be attributable to the municipality. That is, it must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir.1989). Second, the custom must have been the cause of and "the moving force behind" the constitutional violation. Id. at 1157.

431 F.3d 1, 13 (1st Cir. 2005).

There is no admissible evidence in this record from which to infer that there was a well settled and widespread practice of adulterating food.  As for the failure to 'end the practice' plaintiffs concede that Wyman was immediately fired for her part in the incident.  I reject the argument that there is evidence sufficient to create a trial worthy claim that there was a widespread cover-up; to the contrary, the evidence is that there was an immediate investigation even though the plaintiffs never requested one.  There is certainly not enough evidence before me in this case that there is a custom of covering up incidents of staff misconduct at the jail.

## CONCLUSION

For these reasons I recommend that the Court grant the motion for judgment on the pleadings as to Count I as to all the defendants except Wyman and Quick and that it grant the motion for summary judgment on the federal constitutional claims filed on behalf of all the defendants save Wyman and Quick who are not current summary judgment movants.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 18, 2011